**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**   JUDGE CASTEL



| | |
|---|---|
| **JAVAD MAJD, on Behalf of Nokia Retirement Savings and Investment Plan and All Other Similarly Situated Plan Participants and Beneficiaries,** | **10 CIV 3306** <br> Civil Action No.: |
| **Plaintiff,** | |
| **-against-** | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA** |
| **NOKIA, INC., PERSONNEL COMMITTEE OF NOKIA BOARD OF DIRECTORS, PER KARLSSON, HENNING KAGERMANN, MARJORIE SCARDINO, KEIJO SUILA, LINDA FONTENEAUX, NOKIA RETIREMENT SAVINGS AND INVESTMENT PLAN COMMITTEE and JOHN DOES 1-10,** | |
| **Defendants.** | |

RECEIVED
APR 10 2010
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Javad Majd ("Plaintiff"), individually and on behalf of the Nokia Retirement

Savings and Investment Plan (the "Plan"), as well as all other similarly situated Plan participants

and beneficiaries, alleges the following based upon the investigation by Plaintiff's counsel,

which included, *inter alia*, a review of public documents filed by Nokia Corp., and/or its wholly

owned U.S. subsidiary, Nokia, Inc., with the United States Securities and Exchange Commission

("SEC") and the United States Department of Labor ("DOL"), conference calls and

announcements made by Defendants, securities analysts' reports, wire and press releases

published by and regarding the Company, and other publicly available information.

## INTRODUCTION

1.     This is a class action brought pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), on behalf of the Plan, against the Plan fiduciaries.

2.     Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to the Plan and its participants and beneficiaries in violation of ERISA, particularly with regard to the Plan holdings of the American Depository Shares ("ADS") of Nokia Corp., which Defendants knew or should have known was an imprudent investment alternative for the Plan.

3.     This action seeks relief on behalf of the Plan, for Plan losses, for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3)), Plaintiff seeks other relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

4.     Because Plaintiff's claims apply to the participants and beneficiaries of the Plan as a whole, and because ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the Plan, Plaintiff brings this as a class action on behalf of all participants and beneficiaries of the Plan during the period of January 1, 2008 through the present (the "Class Period").

## JURISDICTION AND VENUE

5.     **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

6.     **Personal Jurisdiction.**  ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  As all Defendants are either residents of the United States or subject to service in the United States, this Court has personal jurisdiction over them.

7.      **Venue.**  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Nokia Corp. conducts business in this District, its ADS are traded on the New York Stock Exchange based in this District, and some or all of the fiduciary breaches for which relief is sought occurred in this District.

**PARTIES**

A.      **Plaintiff**

8.      Plaintiff is a resident of Santa Clara County, California.   Plaintiff was and continues to be a Plan participant, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).   During the Class Period, the ADS of Nokia Corp. were purchased or maintained on Plaintiff's behalf by means of the Plan in the Nokia Corp. ADS Fund.

B.      **Defendants**

9.      **Defendant Nokia, Inc.,** located at 6000 Connection Drive, Irving, Texas 75039, is a wholly owned subsidiary of Nokia Corp. (unless specified otherwise, Nokia, Inc. and Nokia Corp. will be referred to collectively herein as "Nokia" or the "Company").   *See* Nokia's Form 20-F (Annual Report for the fiscal year ended December 31, 2009) filed with the SEC on March 12, 2010.   Defendant Nokia, Inc. is both the Plan Sponsor and Administrator.   *See* the annual Plan Form 5500 for the year ending December 31, 2007 ("2007 Form 5500") filed with the DOL.

10.      Defendant Nokia Inc.'s, corporate parent, Nokia Corp., is a public limited liability company incorporated under the laws of the Republic of Finland ("Finland"), with its principal executive offices located at Nokia House, Keilalahdentie 4, 02150 Espoo, Finland.   The Company's ADS are evidenced by American Depository Receipts ("ADR"), issued by Citibank, N.A., as Depository, and are traded on the NYSE under the symbol "NOK."  Nokia files periodic

reports with the SEC, which, on information and belief, are incorporated in the Plan documents and communications to Plan participants and beneficiaries.

11.     Upon information and belief, the Company, at all times, acted through its officers, directors and employees, including, but not limited to, members of (a) the Personnel Committee ("Personnel Committee") of the Nokia Board of Directors ("Board"), and (b) the Retirement Savings and Investment Plan Committee ("Plan Committee"), who were appointed to perform Plan-related fiduciary functions, and did so in the course and scope of their services for the Company.

12.     During the Class Period, the Company was a Plan fiduciary in that it had, upon information and belief, at all applicable times, effective control over the Plan-related activities of its officers, directors and employees.  Through its Board, or otherwise, the Company had the authority and discretion to hire and terminate said officers and employees.  The Company also had the authority and discretion to appoint, monitor and remove officers, directors and employees that performed fiduciary functions with respect to the Plan, including members of the Personnel and Plan Committees.  The actions of the Company's officers, directors, and other employee fiduciaries are imputed to Nokia under the doctrine of *respondeat superior*, and Nokia is liable for these actions.

### *The Personnel Committee Defendants*

13.     **Defendant Personnel Committee**, at all relevant times, acted by and through its members, in administering and managing the Company's equity compensation programs, including the Plan.  During the Class Period, Defendant Personnel Committee and its members were Plan fiduciaries within the meaning of ERISA § 2(21)(A), in that they exercised

discretionary authority or control with respect to the management and administration of the Plan and/or discretionary authority or control over the management and disposition of the Plan assets.

14.     **Defendant Per Karlsson** ("Karlsson") serves as the Chairman of the Personnel Committee.   During the Class Period, Defendant Karlsson was a Plan fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

15.     **Defendant Henning Kagermann** ("Kagermann") serves as a member of the Personnel Committee. During the Class Period, Defendant Kagermann was a Plan fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

16.     **Defendant Marjorie Scardino** ("Scardino") serves as a member of the Personnel Committee. Additionally, Defendant Scardino serves as the Vice Chairman of the Board.  During the Class Period, Defendant Scardino was a Plan fiduciary within the meaning of ERISA, because she exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

17.     **Defendant Keijo Suila** ("Suila") serves as a member of the Personnel Committee. During the Class Period, Defendant Suila was a Plan fiduciary within the meaning of

ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

18.     Defendants Personnel Committee, Karlsson, Kagermann, Scardino and Suila are herein referred to as the "Personnel Committee Defendants."

### *The Plan Committee Defendants*

19.     **Defendant Plan Committee**, at all relevant times, upon information and belief, was comprised of employees, officers, or directors of the Company, who were charged with designating investment funds for the Plan, establishing rules and procedures with respect to the Plan investment funds and monitoring the performance of the Plan investments. Upon information and belief, during the Class Period, the members of the Plan Committee were appointed by the Board.  The Plan Committee and its members were fiduciaries of the Plan within the meaning of ERISA in that they exercised discretionary authority and discretionary control with respect to the Plan's management, administration, investments, and assets.

### *The Plan Administrator Defendant*

20.     **Defendant Linda Fonteneaux** ("Fonteneaux") serves as the Plan Administrator. During the Class Period, Defendant Fonteneaux signed relevant Plan filings with the SEC, including the annual Plan Form 11-K for the year ended December 31, 2008 ("2008 Form 11-K"). Furthermore, during the Class Period, Defendant Fonteneaux signed the relevant Plan filings with the DOL, including the 2007 Form 5500, as the Plan Administrator.  During the Class Period, Defendant Fonteneaux was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority or control with respect to the appointment of the Plan

fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

### *John Doe Defendants*

21.     **Defendants John Does 1-10** are additional Nokia officers, directors, employees, members of the Personnel and Plan Committees and/or any other committees, who were fiduciaries of the Plan during the Class Period, and whose identities are presently unknown to Plaintiff.  Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## THE PLAN

**A.      Nature of the Plan**

22.     The Plan, covering eligible employees of Nokia, Inc., is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a defined contribution plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).  The Plan is sponsored by the Company and the Plan assets are held in trust by the Fidelity Management Trust Company.

23.     The Plan is a legal entity that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is neither plaintiff nor defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. §1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.  Stated differently, in this action Plaintiff seeks relief that is Plan-wide.

24.     According to the Company's 2008 Form 11-K at 4, Plan participants may contribute to the Plan an amount up to 50% of their eligible compensation, of which up to

$15,500 may be contributed on a pretax basis.  The Plan also allows participants age 50 and older and those participants who are eligible to make elective deferrals under the Plan to make additional tax-deferred contributions.  *Id.*

25.     Additionally, Nokia matches each participant's contribution in the amount equal to $1.00 for each $1.00 of participant deferrals, up to 8% of pre-tax compensation.  *Id.*  Both participant and Company contributions can be made in "any combination of investment options under the Plan including Fidelity mutual funds, Nokia ADR shares, and common stocks and other mutual funds through a self-directed brokerage option."  *Id.*

26.     Under the terms of the Plan, Nokia ADS Fund is the principal equity investment option under the Plan.  According to the 2008 Form 11-K at 9, the Plan held $52,955,292 worth of Nokia ADS, or approximately 13% of the Plan assets, for the 2008 Plan year.

27.     Upon information and belief, the Summary Plan Description ("SPD") for the Plan incorporates by reference, certain information filed with the SEC, including but not limited to, annual, quarterly and periodic reports issued by the Company as well as the registration statements, rendering communications contained in such filings with the SEC fiduciary communications with Plan participants and beneficiaries.

**B.      Defendants' Fiduciary Status**

28.     *Named Fiduciaries*.  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

29.     **_De Facto Fiduciaries_**.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.   Thus, a person is a fiduciary to the extent he or she "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

30.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan, and its investments solely in the interest of the Plan participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

31.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

32.     ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still in fact act solely in the interest of participants and beneficiaries, not in the interest of the sponsor.  Moreover, all Plan fiduciaries were obliged, when

wearing their fiduciary hat(s) to act independently of Nokia with respect to the Plan, the Plan investments, or the disclosure of information between and among fiduciaries or from fiduciaries to the Plan participants.

### C.   Defendants' Fiduciary Roles

33.   During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or management or disposition of the Plan assets.  Furthermore, during the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

#### *The Company*

34.   As noted supra, the Company is both the Plan Sponsor and Administrator. According to the 2008 Form 11-K at 4, "[t]he Plan administrator, Nokia, retains responsibility for oversight of the Plan and the Plan's day-to-day administration."

35.   Furthermore, under the terms of the Plan, upon information and belief, the Company, through its Board as well as its officers and employees, including members of the Personnel and Plan Committees, had direct control and management over all aspects of the operation, or administration of the Plan that was not specifically delegated to the named fiduciaries under the Plan and upon information and belief, exercised this control.

36.   As a matter of corporate law, the Company is imputed with the knowledge that its officers and employees had of the misconduct alleged herein, even if not communicated to the Company.

37.   Upon information and belief, the Company exercised responsibility for communicating with participants regarding the Plan, and providing participants with information

and materials required by ERISA.  In this regard, the Company drafted and disseminated various documents and materials related to the Plan, including but not limited to, an SPD and the documents incorporated into the SPD.  Based on the allegations contained herein, the Company is a fiduciary with respect to the Plan because it exercised discretionary authority or control in the administration of the Plan, exercised discretionary authority or control with respect to the management of the Plan assets, and exercised discretionary authority or control with respect to the appointment of other Plan fiduciaries.

### *The Personnel Committee Defendants*

38.     Upon information and belief, Defendant Personnel Committee is responsible for supervising all activity relating to the administration and management of the Company's equity compensation programs, including the Plan.  According to the Personnel Committee's charter, available on Nokia's corporate website, "[t]he [Personnel] Committee has overall responsibility for evaluating, resolving and making recommendations to the Board regarding . . . *all equity based plans* . . . and other significant incentive plans."  (Emphasis added.)

39.     Further, pursuant to its charter,

> *The [Personnel] Committee reviews periodically and makes recommendations to the Board regarding* any long-term incentive compensation, and *all equity plans*, programs or similar arrangements of significance *that the Company establishes for, or makes available to, its employees, the appropriateness of the allocation of benefits under the [p]lans and the extent to which the [p]lans are meeting their intended objectives.*  (Emphasis added.)

> *         *         *

> The foregoing list of duties is not exhaustive, and the [Personnel] Committee may, in addition, perform such other functions as may be necessary or appropriate for the performance of its duties.  The [Personnel] Committee will have the power to delegate its authority and duties to subcommittees or individual members of

- 11 -

the [Personnel] Committee, as it deems appropriate in accordance
with applicable laws and regulations.

40.     As such, the Personnel Committee and its members were fiduciaries of the Plan

during the Class Period, in that they exercised discretionary authority with respect to the

administration and management of the Plan and/or management and disposition of the Plan assets.

### *The Plan Committee Defendants*

41.     Upon information and belief, Defendant Plan Committee and its members are

responsible for directing and coordinating all activity relating to the investment and management

of the Plan assets.  In their capacity to select and monitor investment options for the Plan, the Plan

Committee and its members had the discretion and authority to suspend, eliminate, or reduce any

Plan investment, including investments in Nokia ADS.  Upon information and belief, the Plan

Committee regularly exercised its authority to suspend, eliminate, reduce, or restructure the Plan

investments. The Plan Committee also reported to the Board regarding these duties and the Plan's

events pertaining to the same.

42.     Further, upon information and belief, the Plan Committee exercised responsibility

for communicating with participants regarding the Plan, and providing participants with

information and materials required by ERISA.   In this regard, on behalf of Nokia and the

Personnel Committee Defendants, the Plan Committee disseminated the Plan's documents and

materials.  As such, the Plan Committee was a fiduciary of the Plan during the Class Period, in

that it exercised discretionary authority with respect to the administration and management of the

Plan, and/or management and disposition of the Plan assets.

### *The Plan Administrator Defendant*

43.     Upon information and belief, during the Class Period, Defendant Fonteneaux , the

Plan Administrator, was charged with and exercised her administrative responsibilities pertaining

to the Plan.   Upon information and belief, the Plan Committee may delegate to the Plan Administrator(s) the responsibility of administering and operating the details of the Plan in accordance with the provisions of the Plan and any policies that may from time to time be established by the Plan Committee.   The Plan Administrator(s) has full discretionary authority to determine all questions and to make all factual determinations regarding any and all matters arising in the administration, interpretation and application of the Plan. During the Class Period, Defendant Fonteneaux was a fiduciary of the Plan, in that she exercised discretionary authority with respect to the administration and management of the Plan and/or management and disposition of the Plan assets.

## CLASS ACTION ALLEGATIONS

44.      Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time during the Class Period, *i.e.*, between January 1, 2008 and the present, and whose accounts included investments in Nokia ADS.

45.      The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in or were beneficiaries of the Plan during the Class Period.[1]

---

[1] According to the Form 5500 filed by the Plan with the DOL for the year ending December 31, 2007, there were 6,974 Plan participants at the end of the 2007 Plan year.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiff and other Class members;

(b)     whether Defendants breached their fiduciary duties to Plaintiff and other Class members by failing to act prudently and solely in the interests of Plan participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

(d)     whether the Class members have sustained damages and, if so, the proper measure of those damages.

47.     Plaintiff's claims are typical of the claims of the other Class members because Plaintiff and the other Class members each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

50.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

**A.      Background**

51.     According to its filings with the SEC, Nokia is the world's leading maker of mobile devices. Nokia conducts its operations via three segments:  Devices & Services; NAVTEQ; and Nokia Siemens Networks. The Company's Devices & Services segment designs, develops, and manages its mobile device portfolio, including the sourcing of components.  Nokia also offers consumer Internet services in music, maps, media, messaging, and games and working areas.  The Company's NAVTEQ segment provides digital map information and related location based content and services for automotive navigation systems, mobile navigation devices, Internet-based mapping applications, and government and business solutions.  The Company's Nokia Siemens Networks segment provides wireless and fixed network infrastructure, communications, and networks service platforms, as well as professional services to operators and service providers.

52.     By at least early 2008, Defendants became aware that Nokia was likely to experience production related delays associated with its mid-price range cellular phones,

including certain of its smart phones.  Defendants concealed this fact from the investing public, including the Plan participants, instead touting the Company's expected launch of several new phones.

53.      Facing increasing competition, especially from manufactures in the Asian-Pacific region, Nokia began to slash prices in an attempt to maintain its industry leading market share. As the Class Period progressed, the product supply and other manufacturing problems Nokia experienced with the production of its mid-priced cellular phones caused it to push back the launch of one, high end mid-priced phone.   This delay, coupled with Nokia's aggressive price cutting strategy caused the average selling price ("ASP") of its cellular phones to decline significantly, from EUR 79 in the fiscal first quarter of 2008 to EUR 74 in the fiscal second quarter of 2008 to EUR 72 in the fiscal third quarter of 2008, as the Company was forced to sell a greater percentage of lower priced phones.

54.      The decline in Nokia ASP adversely impacted the operating margins of the Company's highly profitable Devices & Services segment, which excluding special items, also declined during the Class Period, from 21.2% in the fiscal first quarter of 2008 to 20.1% in the fiscal second quarter of 2008, to 18.6% in the fiscal third quarter of 2008.

55.      As a result of the adverse events facing the Company that were undisclosed to the investing public, including the Plan participants, the price of Nokia ADS had plummeted from a Class Period high of $38.25, currently trading at just over $14.00.  This precipitous drop in the worth of the Nokia ADS resulted in significant losses to the Plan and its participants.

**B.      Facts Pertaining To Defendants' Breaches of Fiduciary Duties**

56.      On January 24, 2008, Nokia filed its Form 6-K with the SEC, announcing its

financial results for the fiscal fourth quarter of 2007 and full year 2007, providing in relevant

part that:

**INDUSTRY AND NOKIA OUTLOOK FOR THE FIRST QUARTER AND FULL YEAR 2008**

*      *      *

- We expect Nokia's device market share in the first quarter 2008 to be approximately at the same level sequentially.

- Nokia continues to expect industry mobile device volumes in 2008 to grow approximately 10% from the approximately 1.14 billion units Nokia estimates for 2007.

- Nokia continues to expect the device industry to experience value growth in 2008, but expects some decline in industry ASPs, primarily reflecting the increasing impact of the emerging markets and competitive factors in general,

- Nokia continues to target an increase in its market share in mobile devices in 2008.

*      *      *

**FOURTH QUARTER 2007 FINANCIAL HIGHLIGHTS**

*      *      *

**Mobile Devices**

The combined mobile device volume of our Mobile Phones, Multimedia and Enterprise Solutions business groups for the fourth quarter 2007 was a record 133.5 million units, up 20% sequentially and 27% year on year. Overall industry volumes for the fourth quarter 2007 reached an estimated 336 million units, up 17% sequentially and 16% year on year.

In converged devices, according to Nokia estimates, the total industry volume reached approximately 40.1 million units for the fourth quarter 2007, compared to an estimated 22.1 million units in the fourth quarter 2006. Nokia's own converged device volumes for the fourth quarter 2007 grew to 18.8 million units, compared to 11.1 million units in the fourth quarter 2006. Nokia shipped well over 11 million

Nokia N-series devices and over 2 million Nokia E-series devices during the fourth quarter 2007.

*     *     *

Based on our preliminary market estimate, Nokia's market share for the fourth quarter 2007 was 40%, compared with 39% in the third quarter 2007 and 36% in the fourth quarter 2006. On a year on year basis, Nokia gained market share in every region except North America and Latin America, where market share declined. On a sequential basis, Nokia's market share increased substantially in Middle East & Africa, with modest gains in Europe, Asia-Pacific and Latin America. This was partially offset by a market share decline in North America, as well as a slight decline in China. ***Nokia's device volumes for the fourth quarter 2007 continued to be somewhat constrained by component shortages, linked to the high demand for Nokia products and seasonal industry growth in the fourth quarter. These component constraints have started to ease in the first quarter 2008, as we work with our suppliers to get the necessary supply to match the demand for our products.*** (Emphasis added.)

Nokia's average selling price (ASP) in the fourth quarter 2007 was EUR 83, down from EUR 89 in the fourth quarter 2006 and up from EUR 82 in the third quarter 2007. ***The lower year on year ASP in the fourth quarter 2007 was primarily the result of the negative effect of a significantly higher proportion of entry level device sales and the weaker US dollar on Nokia net sales. The slight sequential increase in ASP in the fourth quarter 2007 reflected a greater percentage of sales of recently launched mid and high end devices, which offset continued robust sales from the entry-level segment.*** (Emphasis added.)

**Mobile Phones**

Fourth quarter 2007 net sales grew 5% to EUR 7.4 billion, compared with EUR 7.1 billion in the fourth quarter 2006. Strong overall volume growth was partially offset by a significant ASP decline year on year, driven primarily by a higher proportion of entry-level sales. Net sales year on year growth was strongest in Middle East & Africa and Asia-Pacific, followed by China. Net sales year on year were down significantly in North America and Latin America and to a lesser degree in Europe.

Mobile Phones operating profit grew 48% to EUR 1.9 billion, compared with EUR 1.3 billion in the fourth quarter 2006, with an operating margin of 25.0% (17.8%). The increase in operating profit for the fourth quarter 2007 was driven primarily by an improved gross margin, compared to the fourth quarter 2006. The increase in Mobile Phones gross margin was primarily due to newer and more profitable devices shipping in volumes, especially in the mid-range.

57.     Nokia's President and Chief Executive Officer ("CEO"), Olli-Pekka Kallasvuo

("Kallasvuo"), commented with respect to the above results that:

Nokia's excellent fourth quarter contributed to a year of high growth and increased profitability for the company, while our industry leading product portfolio drove our device business to an estimated 40% market share in the fourth quarter. At the same time we again increased our quarterly device margins, allowing Nokia to continue to invest for innovation and growth. It was a year of important strategic initiatives by Nokia, with Nokia Siemens Networks starting operations, our internet services effort taking shape around Ovi, and the announcement of the pending acquisition of NAVTEQ.

Facing a market that remains intensely competitive, we are continuing to improve our leading device portfolio as well as execution at Nokia Siemens Networks. With this we believe Nokia is well positioned for growth in 2008.

58.    The same day, on January 24, 2008, Nokia held a conference call with investors and securities analysts, during which Company representatives stated the following:

**CEO Kallasvuo**:

It's good to be on this call after such an impressive fourth quarter at Nokia. But our performance seems at odds with the volatility we all are witnessing in the equity markets and the financial sector. *We closely monitor development in our markets, and the reality as we see it today is that the handset market is strong.* We believe channel inventories for the industry and for Nokia are at normal levels. We are expecting a normal seasonal decline in the device market in Q1, and the demand for our products is good.

I feel quite good about Nokia's fundamentals across the globe. The emerging markets continue to see growth. India and China have each been adding 7 million subscribers a month, and Africa is only just starting to take off. The spread of wireless telephony in these regions has delivered great economic benefit, and our position in these markets remains strong. In Europe, we are benefiting from strong demand for our new products. In Latin America, we have strong share and have steadily delivered a more diversified portfolio, from the entry-level to high-end multimedia computers. And in the U.S., while our position continues to be weak, we are delivering on our commitment to supply customers' products to the major U.S. carriers.

*        *        *

Let's look at the fourth quarter. *Our device business continued its excellent performance, with market share and margins up nicely, as many of our new products clearly started to have a positive impact. We reached an estimated 40% market share in the fourth quarter, and our combined device operating margin was up 2 percentage points sequentially, and 8 points year-on-year, showing again that we can simultaneously increase market share and margin.* (Emphasis added.)

*        *        *

On to the product highlights for the fourth quarter. *As you know, in the fourth quarter we faced our biggest ramp up of new products ever, even while we had component shortages as we ended the quarter, so we certainly had our work cut out for us. I'm pleased to say our teams and suppliers really delivered.* In the entry level, the new Nokia 1200 and 1208, based on our single chip platform, ramped well. These two products combined shipped over 20 million units in the quarter, a big increase from just over 3 million units in Q3, so a really impressive accomplishment.

The Nokia 1110 and 1600 families still had big volumes during the Q, combining to over 30 million units. The Nokia 2630 Barracuda started shipping in volumes in the quarter, and was already in our top 10 volumes. In the mid-range, the Nokia 6300 continued its good momentum, shipping over 7 million units in the fourth quarter. During the quarter, we also started volume shipments of the Nokia 6500 family, and the Nokia 5310 and 5610 XpressMusic devices. The demand was good for all of these devices. In fact, the 6500 family was already in the top 5 for revenue and profit, and sold approximately 1.5 million units in Europe alone. The new 5310 and 5610 were also strong contributors of both revenue and profit in Q4. Nokia N-Series multimedia computers had volumes of well over 11 million units during Q4, and the Nokia N73 and N95 were again the biggest products in revenue for multimedia during the quarter. The N95 continued to see excellent demand and was the number one profit contributor for Nokia. During the fourth quarter, the new N95 8-gig came out of the gate very strong, especially in Europe, performing better than we expected. The combined N95 volumes were up 30% sequentially, and we also sold almost 6 million units since the device started selling. For enterprise solutions, the Nokia E65 was again the best selling product. And the newest products, the Nokia E90 Communicator and E51 also performed very well in the Q. During the quarter we shipped almost 19 million convert devices in total. In 2007, we clearly improved our product portfolio, with products like the 6300 and N95 leading the way. But I am pleased to see that the new products we started shipping in volumes in the fourth quarter are helping to diversify our portfolio further. New products that started shipping in volume in Q4 made up about 30% of our device revenue and profit in the Q [quarter].

*Now the important products for the first quarter. In the entry level, we expect the Nokia 1200 and 1208 will ship in very high volumes, while we expect the 1110 and 1600 families will start their ramp down. We are also expecting the Nokia 2630 Barracuda to continue its good momentum. We plan to start shipping the recently-announced Nokia 2600 classic, the [pin] entry product with changeable covers. In the mid-range, we expect that the Nokia 6300, the 6500 family, and the Nokia 5310 and 5610 XpressMusic devices will be big sellers. For the N-Series, the significant products are expected to again be the Nokia N95 and N73 multimedia computers. The Nokia N82, which we started to ship in Q4, will see significant promotional activity during the quarter. For the E-Series, we expect the key products will be the Nokia E65, E90 Communicator and the Nokia E51. On the Nokia/Siemens Networks, we again delivered improved results, with a sequential increase in net sales and margins in the fourth quarter.* (Emphasis added.)

**<u>Richard A. Simonson ("Simonson"), Nokia's Chief Financial Officer:</u>**

*As we said in our press release today, our overall volumes for the fourth quarter continued to be somewhat constrained by component shortages. In the first quarter, it looks like these have eased, and we are working well with our vendors to get the necessary supply to match the good demand for our products.* Nokia's fourth quarter device average selling price, or ASP, was EUR 83, up slightly sequentially from EUR 82 in Q3, and down 7% year-on-year from EUR 89 in Q4 of 2006. The slight sequential increase in ASP in the fourth quarter reflected a greater percentage of sales from recently launched mid- and high-end devices, which offset continued robust sales from the entry-level segment. The lower year-on-year ASP in the fourth quarter 2007 was primarily the result of the significantly higher portion of entry-level device sales, and some negative effect of the weaker U.S. dollar on Nokia's reported sales. (Emphasis added.)

**Mike Walkley, an analyst with Piper Jaffray:**

I was wondering if I could dig in a little bit more to the lower end of your portfolio. *There have been several competitors indicating they want to go more into the low end. I was wondering if you could update us if you're seeing any of your large OEM competitors in the sub-50 [euro price point] or even the sub-30 euro [price point] segment, and how you see that segment in terms of competitive threat from maybe Asia or other players, longer term?* (Emphasis added.)

**CEO Kallasvuo:**

Okay, so I think there's been quite a lot of talk here in the past when it comes to entering the lower end, and that talk that we need to take very seriously has been ongoing here, and now as well. And it's – *it's very clear, make no mistake about that, that some of our competitors have ambitions when it comes to the lower end of the market. We are taking that very seriously. We are watching them* **and** hence, we really need to look - look at our competitive position and the way we work, really, in a way that we don't rest and become complacent in that respect. *I think especially Samsung's ambitions need to be taken seriously. They will make an effort, but how low can they come here?* I think that's a big question. So really looking at the sub-30 euro market, it's extremely tough. *You need extremely big volumes in order to get there, and be competitive and make money, and so far we have been able to - to defend, in a pretty proactive way, that market.* (Emphasis added.)

**Andrew Griffin, an analyst with Merrill Lynch:**

Hi there guys.  I just wondered what happened, *just following on the low end question, is what happened in China, where if I ex-out your NSN group revenues, it looks like handset revenues actually fell sequentially. Your units were up, implying quite a big fall in average selling prices.* (Emphasis added.)

**CEO Kallasvuo:**

Yes, again there, this might sound a bit - a bit superficial when I say in China *I think the situation is business as usual We didn't see any - any change in the market dynamics that would indicate that we would be somehow - somehow losing our position, or losing markets in that market.* There's always some volatility between the quarters, that's a natural part of this business, has always been, will always be, but *a change in the competitive dynamics in China, we have not seen.* (Emphasis added.)

**CFO Simonson:**

Let me add there, if I may. I mean China, we have to understand, has been growing at 6 million, 7 million new subscribers per month, and that's after having many years of explosive growth. It's interesting, China's always been a higher ASP market than people would have kind of thought. You need to look deeper in there. That's reflective of them purchasing across all the spectrum. But the real acceleration has been in this sub-30 euro end, and we've seen over the year, and also sequentially quarter-on-quarter, a real push there, and that's reflected in our numbers, it's reflected by the push by CMCC [China Mobile Communications Corporation]. So that is a factor in the overall market, and not to be mistaken for Nokia's market position in the dynamics, as Olli-Pekka mentioned.

**Tim Long, an analyst with Bank of America Securities:**

Could you just talk to us a little about the moving parts, when we think about how sustainable the gross margin performance could be? *Maybe if you could talk about the component side, if there was an impact one way or the other on the tight components, you know the impact maybe on having some of your products on allocation, and what new products, new products in the mix, which I guess were about 30%, [meant] to that gross margin line and how we think about it going forward.* (Emphasis added.)

And Olli-Pekka, if you could just clarify, I think you said the channel inventories were lower than they were a year ago. I'm just curious, if your volumes were 25% or so higher entering this year, does that just mean that inventories were too high a year ago? How is that not a positive, as you look into next quarter? How does that not translate into lower channel inventories than normal? Thank you.

**CFO Simonson:**

Okay, Tim, we'll take them in the order you asked in terms of looking at gross margin. Now here - you asked a number of questions here, let me try to step through them in a clear way.

One thing that's important about the gross margin development we had and the sustainability of that, and one of the things that we think can give us some comfort going forward is, think about the gross margins in the low end and the ultra-low end. *We brought those up through the execution of our refresh of the product portfolio there, continuing fresh, coupled with the distribution system, and we brought it up into the, you know, kind of mid-2Os level last year. We worked that higher this year,* I said previously we've gotten those margins up, they are not too different than what we did (inaudible) the overall mobile phone margins. And, you know, that's very important,

that if you can maintain the margin profile in the entry-level and the ultra low end level, and that's where the volume's coming from, and the growth's coming from, that's real important. It gives you that kind of base to work from. And, as you mentioned, in terms of component price, I think there was some concern by many, as people asked about well, with commodity prices rising and that, aren't you going to be unable to get your normal pricing erosion? In fact we didn't see that. And while we're not immune to commodity prices, it, it really hadn't impacted us, and we were able to do better in some other areas, again taking advantage of our scale, and taking advantage of **working closer with our suppliers** so they can minimize their costs along the chain. So we did do very well there in terms of the component cost. (Emphasis added.)

And in terms of allocation, if the question was implying that because we had some component constraint and therefore we're short a little of capacity on some devices and that caused us to be able to price those higher, I don't look at it that way. Allocation to me is when you have such demand for a product that you can't get it out there, and then you are able to do the price. We didn't get any benefit in the gross margin from the fact we were short on a few components, if that was the angle of the question there...

59.    As a result of these positive statements, the price of Nokia ADS increased, rising $4.05, or more than 12%, on January 24, 2008 to $36.48.

60.    Subsequently, on April 2, 2008, Nokia issued a press release announcing four new devices designed to "accelerate the Company's leadership in emerging markets" and a local email solution exclusively for customers in South America.  The Company announced that "the new mobile devices are expected to begin shipping by the third quarter, with an expected price range from EUR 50 to EUR 90, before applicable taxes or subsidies."

61.    The press release provided in relevant part that:

In recent years, the majority of first-time buyers have come from the emerging markets. However, a significant shift is underway – while the first-time buyer market continues to grow, the number of replacement buyers – consumers seeking to replace their current mobile phone with a newer, more advanced model – has also grown substantially in emerging markets. In 2008, Nokia anticipates that for the first time, the number of replacement purchases in emerging markets will exceed those of first-time buyers.

*       *       *

**Nokia 5000 - a powerful package at an accessible price**

Boasting a 1.3 megapixel camera, a high resolution QVGA display, FM radio with recording functionality, MP3 ringtones and more, the Nokia 5000 will set a new standard for functionally and affordability. For mobile entrepreneurs as well as people on the move, the Nokia 5000 supports email and other essential benefits including Nokia Xpress Audio Messaging, Bluetooth and GPRS connectivity. *The Nokia 5000 is expected to begin shipping in the second quarter of 2008 with an estimated retail price of EUR 90, before subsidies and taxes.* (Emphasis added.)

**Nokia 2680 slide - entertainment and Internet access in a sliding design**

Nokia's first slide device for entry markets, the Nokia 2680 slide is a slim camera phone that offers a balance of ease of use and entertainment functionality, including an FM radio with recording capability and MP3 ringtones, and core mobile phone features such as an expanded phone book. Its integrated digital camera ensures spontaneous moments are captured and shared. *The Nokia 2680 slide is expected to begin shipping in the third quarter of 2008 with estimated retail price of EUR 75 before subsidies and taxes.* (Emphasis added.)

**Nokia 7070 Prism - stylish, fold design sets it apart**

Featuring a distinctive folding design with geometric patterns and external light effects, the stylish Nokia 7070 Prism is targeted at people who express their personality through their mobile phone. The Nokia 7070 Prism offers personalized content, including themes and wallpapers, and MP3-grade ringtones. Every aspect of this new phone, including its voice recorder and integrated hands-free speaker, is designed for people who want to stand out from the crowd. *The Nokia 7070 Prism is expected to begin shipping in the third quarter of 2008 with estimated retail price of EUR 50 before subsidies and taxes.* (Emphasis added.)

**Nokia 1680 classic - first phone, first camera**

Nokia's most affordable camera phone to date, the Nokia 1680 classic offers essential mobile phone functionality with the added benefits of a basic digital camera. The phone with VGA camera and video recording features one-touch access for photos and videos. For families or small businesses, the Nokia 1680 classic also offers phone sharing functionality and easy access to email. *The Nokia 1680 classic is expected to begin shipping in the second quarter of 2008 with an estimated retail price of EUR 50 before subsidies and taxes*. (Emphasis added.)

62.     On April 17, 2008, Nokia issued a press release announcing its financial results for its fiscal first quarter of 2008, that provided in relevant part that:

**FIRST QUARTER 2008 HIGHLIGHTS**

\*       \*       \*

- Nokia Devices and Services operating margins of 21.2%, up year on year from 16.0%, down sequentially from 22.8% in Q4 2007, excluding special items.

\*     \*     \*

- Nokia estimated device market share of 39%, up from 36% in Q1 2007 and down from 40% in Q4 2007.

- Nokia device ASP of EUR 79, down from EUR 83 in Q4 2007.  (Device ASP excludes net sales from Services & Software)

\*     \*     \*

**INDUSTRY AND NOKIA OUTLOOK**

\*     \*     \*

- We expect Nokia's mobile device market share in the second quarter 2008 to increase sequentially.

- Nokia continues to expect industry mobile device volumes in 2008 to grow approximately 10% from the approximately 1.14 billion units Nokia estimates for 2007.

- Nokia expects the mobile device market to decline in value in Euro terms in 2008, compared to 2007. The change from our previous estimate of value growth for this market primarily reflects the negative impact of the recently weakened US dollar, the general economic slowdown in the US, and possibly going forward some economic slowdown in Europe.

- Nokia continues to expect some decline in industry ASPs in 2008, primarily reflecting the increasing impact of the emerging markets and competitive factors in general.

- Nokia continues to target an increase in its market share in mobile devices in 2008.

\*     \*     \*