# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JAVAD MAJD and RYAN SHARIF, on
Behalf of Nokia Retirement Savings and
Investment Plan and All Other Similarly
Situated Plan Participants and Beneficiaries,

**Plaintiffs,**

-against-

NOKIA, INC., MARK LOUISON, TIMO J.
KARPPININ, ADELE LOUISE
PENTLAND, RICHARD W. STIMSON,
BENJAMIN C. ADAMS, DARREN A.
BOWIE, CATHERINE CAMLEY, CECILY
COHEN, JOSE CONEJOS, BILLIE
HARTLESS, RONNIE KING, TINA
KREMENETZKY, THOMAS LIBRETTO,
BRIAN MILLER, KIRSTY RUSSELL,
ARTO SIRVIO and JOHN DOES 1-10,

**Defendants.**

Civil Action No.: 1:10-CV-03306

Hon. Judge George B. Daniels

**CONSOLIDATED CLASS ACTION
COMPLAINT FOR VIOLATIONS
OF ERISA**

Plaintiffs Javad Majd and Ryan Sharif ("Plaintiffs"), individually and on behalf of the

Nokia Retirement Savings and Investment Plan (the "Plan"), as well as all other similarly

situated Plan participants and beneficiaries, allege the following based upon the investigation by

Plaintiffs' counsel, which included, *inter alia*, a review of available governing Plan documents,

public documents filed by Nokia Corp., and/or its wholly owned U.S. subsidiary, Nokia, Inc.[1],

with the United States Securities and Exchange Commission ("SEC") and the United States

Department of Labor ("DOL"), conference calls and announcements made by Defendants,

securities analysts' reports, wire and press releases published by and regarding the Company,

and other publicly available information.

---

[1]      Unless specified otherwise, Nokia, Inc. and Nokia Corp. will be referred to collectively
herein as "Nokia" or the "Company").

## INTRODUCTION

1.      This is a class action brought pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), on behalf of the Plan, against the Plan fiduciaries.

2.      Plaintiffs allege that Defendants, as fiduciaries of the Plan, breached their duties to the Plan and its participants and beneficiaries in violation of ERISA, particularly with regard to the Plan holdings of the American Depository Receipts ("Nokia Stock") of Nokia Corp., which Defendants knew or should have known was an imprudent investment alternative for the Plan.

3.      Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interests of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence and diligence in administering the Plan and the Plan assets during the period of January 1, 2008 through the present (the "Class Period").

4.      Defendants allowed the imprudent investment of the Plan assets in Nokia Stock throughout the Class Period, even though they knew or should have known that such investment was unduly risky and imprudent.  Specifically, Defendants knew or should have known that during the Class Period:  (1) positive statements about Nokia's new product launches lacked reasonable basis given the component supply shortages, manufacturing and software problems Nokia was facing; (2) Nokia was losing market share due to intense price cuts by competitors; (3) while the Company representatives stated that they expected the overall industry ASPs to decline in 2008, Defendants failed to disclose to the Plan participants that Nokia dramatically slashed its ASPs to maintain its market share due to severe price competition; (4) the Company had decreasing operating and profit margins due to the failed strategy of competing mainly at the low-end of the cell phone market, yet simultaneously claimed that it had new products and growth strategies that would enable them to compete in the high-end market; and (5) Nokia championed

its Symbian operating system even though it was never able to compete with those of its competition.

5.     As is more fully alleged below, during the Class Period, Defendants with responsibility for the Plan investments, imprudently permitted the Plan to offer, hold and acquire millions of dollars in Nokia Stock when it was imprudent to do so. Defendants also failed to provide Plan participants with complete and accurate information with respect to the Plan investments in Nokia Stock. Neither did certain of the Defendants provide this critical information to their co-fiduciaries or properly monitor their fiduciary appointees during the Class Period with regard to the management and disposition of the Plan assets, including Plan holdings of Nokia Stock.

6.     Defendants breached their fiduciary duties when they failed to: (a) conduct an appropriate investigation into whether Nokia Stock was a prudent investment for the Plan; (b) develop appropriate investment guidelines for Nokia Stock; (c) divest the Plan of Nokia Stock; (d) remove Nokia Stock as an investment option for the Plan; (e) either consult with or appoint independent fiduciaries regarding the appropriateness of investing in Nokia Stock; and (f) resign as fiduciaries of the Plan if they could not loyally serve the Plan and its participants.

7.     Defendants' breaches have caused tens of millions of dollars of losses to the Plan and its participants.

8.     This action seeks relief on behalf of the Plan, for Plan losses, for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3)), Plaintiffs seek other relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

9.     Because Plaintiffs' claims apply to the participants and beneficiaries of the Plan as a whole, and because ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the Plan, Plaintiffs bring this as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period.

10.     In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are made by necessity on information and belief. When Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint to add additional facts that further support Plaintiffs' claims.

## JURISDICTION AND VENUE

11.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.     **Personal Jurisdiction.** ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). As all Defendants are either residents of the United States or subject to service in the United States, this Court has personal jurisdiction over them.

13.     **Venue.** Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Nokia Corp. conducts business in this District, its American Depository Shares ("ADS") are traded on the New York Stock Exchange based in this District, and some or all of the fiduciary breaches for which relief is sought occurred in this District.

## PARTIES

### A.     Plaintiffs

14.     Plaintiff Majd is a resident of Santa Clara County, California. Plaintiff was and continues to be a Plan participant, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§

1002(7) and 1132(a). During the Class Period, the Nokia Stock was purchased or maintained on Plaintiff's behalf by means of the Plan in the Nokia Corp. Stock Fund.

15. Plaintiff Sharif is a resident of Solano County, California. Plaintiff was and continues to be a Plan participant, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a). During the Class Period, Nokia Stock was purchased or maintained on Plaintiff's behalf by means of the Plan in the Nokia Corp. Stock Fund.

### B.    Defendants

16. During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or management or disposition of the Plan assets. Furthermore, during the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

17. **Defendant Nokia, Inc.,** located at 6000 Connection Drive, Irving, Texas 75039, is a wholly owned subsidiary of Nokia Corp. Nokia's Form 20-F (Annual Report for the fiscal year ended December 31, 2009) filed with the SEC on March 12, 2010.

18. Defendant Nokia Inc.'s, corporate parent, Nokia Corp., is a public limited liability company incorporated under the laws of the Republic of Finland ("Finland"), with its principal executive offices located at Nokia House, Keilalahdentie 4, 02150 Espoo, Finland. The Company's ADS are evidenced by American Depository Receipts ("ADR"), issued by Citibank, N.A., as Depository, and are traded on the NYSE under the symbol "NOK." Nokia files periodic reports with the SEC, which, on information and belief, are incorporated in the Plan documents and communications to Plan participants and beneficiaries.

19. Defendant Nokia, Inc. is a named fiduciary of the Plan. Trust Agreement between Nokia, Inc. and Fidelity Management Trust Company, dated April 1, 2005 ("Trust Agreement") at 4. Pursuant to the Trust Agreement at 9, Nokia, Inc. may determine whether to offer Nokia Stock as a Plan investment option.

20. Defendant Nokia, Inc. is also both the Plan Sponsor and Administrator. Annual Plan Form 5500 for the year ending December 31, 2007 ("2007 Form 5500") filed with the DOL. According to the Plan annual report on Form 11-K for the fiscal year ended December 31, 2009 ("2009 Form 11-K") at 4, "[t]he Plan administrator, Nokia, retains responsibility for oversight of the Plan and the Plan's day-to-day administration." Upon information and belief, Nokia, as the Plan Administrator, has full discretionary authority to determine all questions and to make all factual determinations regarding any and all matters arising in the administration, interpretation and application of the Plan.

21. Besides the fiduciary duties it retained under the governing Plan documents with respect to Plan administration and selection and management of the Plan assets including Nokia Stock, during the Class Period, upon information and belief, the Company had, at all applicable times, effective control over the Plan-related activities of its officers, directors and employees. As such, Nokia had direct control and management over all aspects of the operation and management of the Plan, and upon information and belief, exercised its control.

22. Upon information and belief, the Company, at all times, acted through its officers, directors and employees, including, but not limited to, members of (a) the Nokia, Inc. Board of Directors ("Board"), and (b) the Retirement Savings and Investment Plan Committee ("Plan Committee"), who were appointed to perform Plan-related fiduciary functions, and did so in the course and scope of their services for the Company.

23.     Furthermore, upon information and belief, Nokia exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA.   In this regard, Nokia drafted and disseminated to Plan participants various documents and materials related to the Plan, including but not limited to, an annual Prospectus for the investment funds available under the Plan.

24.     The Company also had the authority and discretion to hire, appoint, monitor and remove or terminate officers, directors and employees that performed fiduciary functions with respect to the Plan, including members of the Nokia, Inc. Board and the Plan Committee. As a matter of corporate law, the Company is imputed with the knowledge that its officers and employees had of the misconduct alleged herein, even if not communicated to the Company. The actions of the Company's officers, directors, and other employee fiduciaries are imputed to Nokia under the doctrine of *respondeat superior*, and Nokia is liable for these actions.

25.     Accordingly, based on the allegations contained herein, Nokia is a fiduciary with respect to the Plan because at all relevant times, it exercised discretionary authority or responsibility with respect to:   (i) the administration and management of the Plan; (ii) management and disposition of the Plan assets; and (iii) appointment and supervision of other Plan fiduciaries.

### *Nokia, Inc. Director Defendants*

26.     During the Class Period, upon information and belief, the Nokia, Inc. Board was charged with appointment, and thus the supervision of various Plan fiduciaries, including members of the Plan Committee. Furthermore, according to the 2009 Form 11-K at 4, the Board had the discretion to determine certain Company contributions to the Plan.

27.     **Defendant Mark Louison** ("Louison"), during all or a part of the Class Period, has served as the director of Nokia, Inc.  Additionally, Defendant Louison has been President of Nokia Inc. since April 1, 2007 and Head of Devices Business of Nokia Corp. since July 1, 2007. Defendant Louison is also a member of the global Management Board for Nokia Networks. Defendant Louison served previously as Head of Networks business in North America at Nokia Corp., overseeing sales, marketing, strategic planning, technical support and field operations. Defendant Louison joined Nokia in January 2003 as Vice President and General Manager of Nokia's AT&T Wireless account.  During the Class Period, Defendant Louison was a Plan fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

28.     **Defendant Timo J. Karppinin** ("Karppinin"), during all or a part of the Class Period, has served as the director of Nokia, Inc. and a member of the Plan Committee.  During the Class Period, Defendant Karppinin was a Plan fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

29.     **Defendant Adele Louise Pentland** ("Pentland"), during all or a part of the Class Period, has served as the director of Nokia, Inc.  Defendant Pentland joined Nokia in 1998 and has served as Senior Vice President and Chief Legal Officer, responsible for managing the in-house legal and intellectual property functions for Nokia Corp. on a global basis.  Defendant

Pentland has previously served as the North America General Counsel and Vice President, whiles also serving as the acting Legal Officer of Nokia Corp. from September 2007. During the Class Period, Defendant Pentland was a Plan fiduciary within the meaning of ERISA, because she exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

30. **Defendant Richard W. Stimson** ("Stimson"), during all or a part of the Class Period, has served as the director of Nokia, Inc. Defendant Stimson also serves as Vice President and Legal Counsel at the Company. During the Class Period, Defendant Stimson was a Plan fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

31. **Defendant Benjamin C. Adams** ("Adams"), during all or a part of the Class Period, has served as the director of Nokia, Inc. From March 2010, Defendant Adams has served as Legal Head of Nokia India's operations which include manufacturing, R&D, sales and marketing as well as legal support for services offerings across key emerging markets. Previously, from January 2007 through March 2010, Defendant Adams led Nokia's M&A legal team, which is responsible for transactional legal support for all of Nokia's acquisitions, divestitures, joint ventures and minority investments (including fund investments). During the Class Period, Defendant Adams was a Plan fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan

fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

32.     **Defendant Darren A. Bowie** ("Bowie"), during all or a part of the Class Period, has served as the director of Nokia, Inc.  From January 2008, Defendant Bowie has also led the legal team that provides support for Nokia's business in North America, including the negotiation of commercial contracts and licensing agreements with wireless carriers, distributors, retailers, and software, media, and entertainment companies. Defendant Bowie also supervises intellectual property, litigation, privacy and data security, product safety, and regulatory matters affecting Nokia's markets in North America.  During the Class Period, Defendant Bowie was a Plan fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

33.     Defendants Louison, Karppinin, Pentland, Stimson, Adams and Bowie are herein collectively referred to as the "Nokia Inc. Director Defendants."

### *The Plan Committee Defendants*

34.     According to the governing Plan documents, the Plan Committee, at all relevant times, was comprised of employees, officers, or directors of the Company, who were charged with designating investment funds for the Plan, establishing rules and procedures with respect to the Plan investment funds and monitoring the performance of the Plan investments.  Upon information and belief, during the Class Period, the Plan Committee members were appointed by the Nokia, Inc. Board.

35.     Pursuant to the Plan Committee's Charter as revised on October 2007 ("Plan Committee Charter"):

> The [Plan] Committee voting members shall be:
>
> - Representative of a Business Unit/Shared Service or Subject Matter Expert.
>
> - Sufficiently knowledgeable about 401k plans in general, and Nokia's Plan design in particular, to render sound decisions.
>
> - Have sufficient ability to adequately represent their business group and/or functional area.
>
> In addition to being representative of the Business Units the following groups are required to have ongoing representation on the Committee:  Corporate Finance, Corporate Legal, Senior Human Resources, and a 401(k) subject matter expert (SME).
>
> Composition of the Committee is to be reviewed annually to ensure that it reflects the current population.

36.     With respect to the Plan Committee's fiduciary duties under the Plan, the Plan Committee Charter provides:

> The 401k Committee ("Committee") is responsible for submitting to the Nokia Inc. Board of Directors ("Board"), recommendations on the design and administration of the Nokia Retirement Savings and Investment Plan ("Plan") that supports the mission, values and goals of Nokia employees.  The Committee is responsible for the Investment Guidelines ("Guidelines") of the Plan and for ensuring that fund offerings are aligned with the Investment Guidelines.
>
> The scope of this Committee's duties and authorities is determined solely by the Nokia Savings and Retirement Plan. . . .

37.     The Plan Committee Charter further provides:

> The specific responsibilities of the Committee include (but are not limited to):
>
> - Review of Plan documentation for legal and regulatory compliance.

- ***Recommend changes to the Plan.***

- ***Review of fund performance and recommendations on fund replacement/addition/removal as needed.***

- Review of participant appeals and make determination on administrative solution to appeal if needed.

38.     Upon information and belief, the Plan Committee Defendants (as defined below) are responsible for directing and coordinating all activity relating to the investment and management of the Plan assets. In their capacity to select and monitor investment options for the Plan, the Plan Committee Defendants had the discretion and authority to suspend, eliminate, or reduce any Plan investment, including investments in Nokia Stock.

39.     According to the Nokia Retirement Savings and Investment Plan Investment Policy Statement (revised in February 2009) ("Plan Investment Policy"):

The Committee is responsible for determining:

- Number and type of investment choices; and

- Selection or removal of investment funds and investment consultants.

    The Committee's responsibilities include the review, on a timely basis, but not less than annually, of each fund's investment results, as well as an assessment of each investment fund's organization, people, and processes.

    Such decisions may be subject to the Committee's review and/or consultation.

40.     Upon information and belief, the Plan Committee Defendants regularly exercised its authority to suspend, eliminate, reduce, or restructure the Plan investments. The Plan Committee Defendants also reported to the Nokia, Inc. Board regarding these duties and the Plan's events pertaining to the same.

41.     Further, upon information and belief, the Plan Committee Defendants exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA. In this regard, on behalf of Nokia, the Plan Committee Defendants disseminated the Plan's documents and materials. As such, the Plan Committee Defendants were fiduciaries of the Plan during the Class Period, in that they exercised discretionary authority with respect to the administration and management of the Plan, and/or management and disposition of the Plan assets.

42.     **Defendant Catherine Camley** ("Camley"), during all or a part of the Class Period, has served as member of the Plan Committee. During the Class Period, Defendant Camley was a Plan fiduciary within the meaning of ERISA, because she exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

43.     **Defendant Cecily Cohen** ("Cohen"), during all or a part of the Class Period, has served as member of the Plan Committee. From July 2008, Defendant Cohen has also served as Head of Strategy, Planning and Insights for Nokia's North America Markets. During the Class Period, Defendant Cohen was a Plan fiduciary within the meaning of ERISA, because she exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

44.     **Defendant Jose Conejos** ("Conejos"), during all or a part of the Class Period, has served as member of the Plan Committee. From January 2009, Defendant Conejos has also

served as the Head of Human Resources of Nokia's North America operations. Previously, from April 2005 through January 2009, Defendant Conejos served as the Vice President of Human Resources. During the Class Period, Defendant Conejos was a Plan fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

45. **Defendant Billie Hartless** ("Hartless"), during all or a part of the Class Period, has served as member of the Plan Committee. Defendant Hartless serves as Nokia's Vice President of Human Resources. During the Class Period, Defendant Hartless was a Plan fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

46. **Defendant Karppinin**, as noted *supra*, during all or a part of the Class Period, has served as member of the Plan Committee, in addition to serving as Nokia, Inc. director. During the Class Period, Defendant Karppinin was a Plan fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

47. **Defendant Ronnie King** ("King"), during all or a part of the Class Period, has served as member of the Plan Committee. During the Class Period, Defendant King was a Plan

fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

48.     **Defendant Tina Kremenezky** ("Kremenezky"), during all or a part of the Class Period, has served as member of the Plan Committee. Defendant Kremenezky also serves as the Senior Legal Counsel at Nokia, Inc. During the Class Period, Defendant Kremenezky was a Plan fiduciary within the meaning of ERISA, because she exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

49.     **Defendant Thomas Libretto** ("Libretto"), during all or a part of the Class Period, has served as member of the Plan Committee. During the Class Period, Defendant Libretto was a Plan fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

50.     **Defendant Brian Miller** ("Miller"), during all or a part of the Class Period, has served as member of the Plan Committee. Defendant Miller also serves as the Director of Global Benefits and Pension Functions of Nokia, Inc. During the Class Period, Defendant Miller was a Plan fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority

or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

51.     **Defendant Kirsty Russell** ("Russell"), during all or a part of the Class Period, has served as member of the Plan Committee.  Defendant Russell also serves as the Vice President of Nokia's Human Resources Global Practices.  During the Class Period, Defendant Russell was a Plan fiduciary within the meaning of ERISA, because she exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

52.     **Defendant Arto Sirvio** ("Sirvio"), during all or a part of the Class Period, has served as member of the Plan Committee.  During the Class Period, Defendant Miller was a Plan fiduciary within the meaning of ERISA, because he exercised discretionary authority or control with respect to the appointment of the Plan fiduciaries, exercised discretionary authority or control with respect to the administration of the Plan, and exercised discretionary authority or control with respect to the management of the Plan assets.

53.     Defendants Camley, Cohen, Conejos, Hartless, Karppinin, King, Kremenezky, Libretto, Miller, Russell and Sirvio are herein collectively referred to as the "Plan Committee Defendants."

### *John Doe Defendants*

54.     **Defendants John Does 1-10** are additional Nokia officers, directors, employees, members of the Plan Committee and/or any other committees, who were fiduciaries of the Plan during the Class Period, and whose identities are presently unknown to Plaintiffs.  Once their identities are ascertained, Plaintiffs will seek leave to join them under their true names.

## THE PLAN

### A.    Nature of the Plan

55.    The Plan, covering eligible employees of Nokia, Inc., is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a defined contribution plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). The Plan is sponsored by the Company and the Plan assets are held in trust by the Fidelity Management Trust Company.

56.    The Plan is a legal entity that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither plaintiff nor defendant. Rather, pursuant to ERISA § 409, 29 U.S.C. §1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan. Stated differently, in this action Plaintiff seeks relief that is Plan-wide.

57.    Pursuant to the Plan Investment Policy at 1, the "objective of the Plan is to help participants in accumulating savings to achieve financial security upon retirement."

58.    According to the Company's 2009 Form 11-K at 4, Plan participants may contribute to the Plan an amount up to 50% of their eligible compensation, of which up to $16,500 may be contributed on a pretax basis. The Plan also allows participants age 50 and older and those participants who are eligible to make elective deferrals under the Plan to make additional tax-deferred contributions (up to $5,500 during fiscal year 2009). *Id.*

59.    Additionally, Nokia matches each participant's contribution in cash in the amount equal to $1.00 for each $1.00 of participant deferrals, up to 8% of pre-tax compensation. *Id.* Both participant and Company contributions can be invested in "any combination of investment options under the Plan including Fidelity mutual funds, Nokia ADR shares, and common stocks and other mutual funds through a self-directed brokerage option." *Id.* The 2009 Form 11-K

- 17 -

further provides that "[a]dditional discretionary [Company] contributions may be made upon the approval of the Company's Board of Directors." *Id.*

60.    At all relevant times, the Plan offered "several 'core' investment alternatives to plan participants." Nokia Retirement Savings and Investment Plan Summary Plan Description (As Revised 2004) (the "2004 SPD") at 5. These alternatives "have varying objectives and risk and return characteristics." *Id.* According to the Plan Investment Policy at 2, the Plan Committee "has the flexibility of adding additional asset classes as they find prudent."

61.    During the Class Period, the Plan investment options included the Nokia Stock Fund, invested in American Depository Receipts of Nokia Corp. *Id.* According to the Trust Agreement at 7, the Nokia Stock Fund is "the investment option consisting of Sponsor Stock [defined at the same page as the "common stock of the Sponsor, or such other publicly traded stock of the Sponsor, or such other publicly-traded stock of the Sponsor's affiliates as meets the requirements of section 407(d)(5) of ERISA with respect to the Plan] and cash or short term liquid investments."

62.    According to the Plan participants' Guide to the Nokia Retirement Savings and Investment Plan ("Guide") at 15, the Nokia Stock Fund "seeks to increase the value of [participants'] investments over the long term by investing in the common stock of [participants'] employer or its affiliate."

63.    Nokia Stock Fund is the principal equity investment option under the Plan. According to the 2009 Form 11-K at 9, the Plan held $47,777,668 worth of Nokia Stock, or approximately 9% of the Plan assets for the 2009 Plan year and $52,955,292 worth of Nokia Stock, or approximately 13% of the Plan assets, for the 2008 Plan year.

64.     The Plan does not require investment in the Nokia Stock. Rather, at all relevant times, the investment options offered under the Plan were under the sole discretion of the Plan fiduciaries, including the Plan Committee that could "make changes to this set of fund options (core options and the brokerage window), as considered appropriate and prudent, at any time in the future." Plan Investment Policy at 2. *See also* 2004 SPD at 1 ("The [Plan] committee has selected a number of investment alternatives that are available to plan participants."

65.     Furthermore, according to the Trust Agreement at 9, "[t]he Named Fiduciary [*i.e.*, Nokia, Inc.] may determine to offer as investment options only: (i) Mutual Funds, (ii) Sponsor Stock, (iii) notes evidencing loans to Participants in accordance with the terms of the Plan, (iv) BrokerageLink, (v) Existing Stable Value Investments, and (vi) collective investment funds maintained by the Trustee for qualified plans." Accordingly, it is in the Company's discretion whether to offer Nokia Stock to Plan participants as an investment option at any given time.

66.     The Trust Agreement further provides in relevant part:

> The investment options ***initially selected*** by the Named Fiduciary are identified on Schedule "C" attached hereto. Upon transfer to the Trust, Plan assets will be invested in the investment option(s) as directed by the Sponsor. The Named Fiduciary may add additional investment options with the consent of the Trustee to reflect administrative considerations and upon mutual amendment of this Agreement, and the Schedules thereto, to reflect such additions. *Id*. at 9 (emphasis added).

67.     The Nokia Stock is listed among the investment options on Schedule C to the Trust Agreement initially selected by the Company for the Plan. Trust Agreement at 41. The Plan documents do not require that the Nokia Stock continue to be offered if it becomes imprudent to do so. Rather, the Trust Agreement at 12 instructs that: "[t]he Named Fiduciary shall continually monitor the suitability of acquiring and holding Sponsor Stock under the fiduciary duty rules of section 404(a) of ERISA (as modified by section 404(a)(2) of ERISA)."

Additionally, the Board retains broad discretion over the Plan and may terminate the Plan at any time. 2009 Form 11-K at 5 ("the Company may discontinue the Plan at any time subject to the provisions of ERISA."

68.     Even when the Nokia Stock Fund is determined to be offered to the Plan participants as an investment option, the Plan does not require the Nokia Stock Fund to be invested wholly in Nokia Stock. According to the Trust Agreement at 11, "[i]nvestments in the Stock Fund shall consist *primarily* of shares of Sponsor Stock. The Stock Fund shall also include cash or short-term liquid investments . . ." Emphasis added.

69.     Upon information and belief, the Plan documents incorporate by reference, certain information filed with the SEC, including but not limited to, annual, quarterly and periodic reports issued by the Company as well as the registration statements, rendering communications contained in such filings with the SEC fiduciary communications with Plan participants and beneficiaries. Furthermore, the Trust Agreement provides at 13 that "[t]he Named Fiduciary shall be responsible for filing all reports required under Federal or state securities laws with respect to the Trust's ownership of Sponsor Stock, including, without limitation, any reports required under section 13 or 16 of the Securities Exchange Act of 1934, and shall immediately notify the Trustee in writing of any requirement to stop purchases or sales of Sponsor Stock pending the filing of any report."

**B.      Defendants' Fiduciary Status Under the Plan**

70.     *Named Fiduciaries.* ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as the "administrator" in the plan instrument is automatically a named fiduciary,

and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

71. ***De Facto Fiduciaries***. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent he or she "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

72. As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan, and its investments solely in the interest of the Plan participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

73. Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plan management and administration. Rather, as set forth above, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

74. ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. §

1108(c)(3), but insider fiduciaries must still in fact act solely in the interest of participants and beneficiaries, not in the interest of the sponsor. Moreover, all Plan fiduciaries were obliged, when wearing their fiduciary hat(s) to act independently of Nokia with respect to the Plan, the Plan investments, or the disclosure of information between and among fiduciaries or from fiduciaries to the Plan participants.

## CLASS ACTION ALLEGATIONS

75.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time during the Class Period, *i.e.*, between January 1, 2008 and the present, and whose accounts included investments in Nokia Stock.

76.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, thousands of members of the Class who participated in or were beneficiaries of the Plan during the Class Period.[2]

77.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiffs and other Class members;

---

[2]     According to the Form 5500 filed by the Plan with the DOL for the year ending December 31, 2007, there were 6,974 Plan participants at the end of the 2007 Plan year.

(b)     whether Defendants breached their fiduciary duties to Plaintiffs and other Class members by failing to act prudently and solely in the interests of Plan participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

(d)     whether the Class members have sustained damages and, if so, the proper measure of those damages.

78.     Plaintiffs' claims are typical of the claims of the other Class members because Plaintiffs and the other Class members each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

79.     Plaintiffs will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

80.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

81.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any

questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### A. Company Background

82.     Nokia, a manufacturer of mobile devices and provider of various communication services, conducts its operations via three divisions: Devices & Services; NAVTEQ; and Nokia Siemens Networks.

a.      The Company's Devices & Services division was created on January 1, 2008 through the merger of three of Nokia's mobile device business groups: Mobile Phones, Multimedia and Enterprise Solutions. This division designs, develops, and manages its mobile device portfolio, including the sourcing of components. It also offers consumer Internet services in music, maps, media, messaging, and games and working areas. As Nokia's flagship business division, Devices & Services generated all of the company's operating profit during the Class Period.

b.      The Company's NAVTEQ division stems from its acquisition of NAVTEQ Corporation on October 1, 2007. NAVTEQ provides digital map information and related location based content and services for automotive navigation systems, mobile navigation devices, Internet-based mapping applications, and government and business solutions.

c.      The Company's Nokia Siemens Networks ("NSN") division was created on April 1, 2007 and is jointly owned by Nokia and Siemens. NSN provides wireless and fixed network infrastructure, communications, and networks service platforms, as well as professional services to operators and service providers.

**B.      Factors Affecting Nokia's Position In Emerging Markets**

83.      A significant factor in the profitability of any business based in mobile communications devices is the average selling prices ("ASPs") of their mobile devices. As the production and marketing costs are primarily fixed for any given product, absent mitigating factors, a higher ASP typically results in greater profit margins. Thus, a decrease in the ASP for mobile devices is usually considered a negative in the industry because it means that there is less profit for each product sold.

84.      Both prior to and during the class period, ASPs for mobile devices were experiencing an industry-wide decline. This pricing decline was generally considered to be substantially due to an increase in sales of lower priced phones in the world's emerging markets. Emerging markets are generally defined as nations with social or business activity in the process of rapid growth, with China and India considered to be the two largest emerging markets world-wide.

85.      Nokia was not insulated from these industry-wide declines and, prior to the class period, its ASPs for mobile devices experienced a significant decrease. Specifically, the ASP for the fourth quarter of 2006 was EUR 89, while the ASP for the fourth quarter of 2007 was only EUR 83.

86.      As the decline of ASPs for mobile devices continued across the industry, Nokia advised the market that it was not shielded from the effects of emerging market competition and competitive factors generally. Moreover, Nokia admitted that it expected to see its own ASPs continue to drop. However, while Nokia acknowledged the expected drop in ASPs, it simultaneously claimed that the expected decline would actually be a boon to Nokia's business generally. Specifically, Nokia claimed the Company's strong position in emerging markets

would allow it to increase the number of units sold, thus offsetting the inevitable decline of profits on a per-phone basis. As the Company stated, while "the industry overall average selling prices are expected to decline," "that's a good thing for Nokia . . . because we're able to deliver sales growth [in emerging markets]." Nokia further noted that China and India were collectively adding 14 million new subscribers per month and that Africa was "only just starting to take off."

87.     Nokia further supported its claim that the Company was in a strong position to increase sales in the emerging markets by touting its new product offerings. The Company consistently stated that new phones in Nokia's development pipeline would imminently be available for sale in the markets and that new products would continue to be available to counter the adverse effects of decreases in ASPs, product margins and increased competition. However, as confirmed by former employees and Nokia's own subsequent disclosures, this was not an accurate portrayal of Nokia's product development and manufacturing situation.

88.     As the Company entered into fiscal first quarter of 2008, it continued to face increased competition in the lower priced emerging cellular markets. In response to the competitive threats to its business, Nokia began to drastically slash prices on its phones in emerging markets in an attempt to increase market share and sales volume in these regions.

89.     However, the increased competition was especially fierce within the Chinese market and, even with its severe price reductions, Nokia was having extreme difficulties maintaining its industry leading market share in China. As a result, at some point in the Class Period, Nokia abruptly changed course and internally decided to no longer compete on price in the Chinese market. This decision ran counter to the strategy the Company previously touted and had already begun executing in China (to increase total sales volume of lower priced phones to counter decreasing industry ASPs and product margins). Even though this business decision to

cease competitive pricing in the world's largest emerging market reflected a dramatic shift in Nokia's global business approach and substantially affected the Company by greatly reducing the units sold, this information was not disclosed to the public.

90. Ultimately, the increased business competition, the significant reduction of phone prices and the delays in production led to an additional decrease in the ASP of Nokia's cellular phones. While the ASP was EUR 79 in the fiscal first quarter of 2008, it had fallen to EUR 74 in the fiscal second quarter and by the fiscal third quarter of 2008, it had dropped to EUR 72. In spite of Nokia's assurances to the contrary, the decrease in the ASP was detrimental to the operating profits of the Company during the Class Period. This can be easily seen in Nokia's operating margins for its Devices & Services segment, which continuously decreased during 2008 from 21.2% in the first quarter of the year to 20.1% in the second quarter and 18.6% in the third quarter.

91. As a result of the adverse events facing the Company that were undisclosed to the investing public, including the Plan participants, the price of Nokia Stock had plummeted from a Class Period high of $38.25 to its currently value of just $9.90 per share. This precipitous drop in the worth of the Nokia Stock resulted in significant losses to the Plan and its participants.

**C.    Facts Pertaining To Defendants' Breaches of Fiduciary Duties**

92. The Class Period begins on January 1, 2008. Upon information and belief, by this time, if not earlier, Defendants became aware that Nokia was likely to experience production related delays associated with its mid-price range cellular phones, including certain of its smart phones and that as such, Nokia would not be able to counter the adverse effects of decreases in ASPs that were facing the entire smartphone manufacturing industry. Defendants concealed these facts from the investing public, including the Plan participants, instead touting the Company's

expected launch of several new phones. Defendants also continued to offer Nokia Stock as a Plan investment option and to make and maintain investments in the Nokia Stock Fund throughout the Class Period, all the while they knew or should have known that the Company was facing serious business problems that would in turn severely impact the price of its stock and hence the value of Plan participants' retirement savings.

93.     On January 24, 2008, Nokia issued a press release announcing its year end and fiscal fourth quarter ("Q4") financial results for the 2007 year, filed its Form 6-K with the SEC, which reaffirmed the financial results in the press release, and held a conference call with securities analysts to discuss such results.

94.     Through these communications, Nokia executives explained to investors, including the Plan participants, that during the fourth quarter of 2007, the operating profit of Nokia's Mobile Devices business had substantially increased while there were industry-wide decreases in ASPs. The Company's ASPs had decreased by 7% year over year during Q4, while its Mobile Phones operating profit had increased by a 48% during the same time period, from EUR 1.3 billion in Q4 of 2006 to EUR 1.9 billion in Q4 of 2007. The Company attributed this result to increased unit volumes[3], specifically on its new, more profitable mid and high-end devices.

95.     Nokia's January 24, 2008, press release entitled, "Nokia Q4 2007 net sales of EUR 15.7 billion, EPS of EUR 0.47 (EUR 0.47 excluding special items)," in relevant part, stated:

FOURTH QUARTER 2007 FINANCIAL HIGHLIGHTS

\*       \*       \*

Mobile Devices

The combined *mobile device volume* of our Mobile Phones, Multimedia and Enterprise Solutions business groups for the fourth quarter 2007 *was a record*

---

[3]     Increases in Nokia's unit volumes relative to the industry as a whole is referred to as Nokia's market share.

***133.5 million units, up 20% sequentially and 27% year on year.***[i] Overall industry volumes for the fourth quarter 2007 reached an estimated 336 million units, up 17% sequentially and 16% year on year.

In converged devices, according to Nokia estimates, the total industry volume reached approximately 40.1 million units for the fourth quarter 2007, compared to an estimated 22.1 million units in the fourth quarter 2006. Nokia's own converged device volumes for the fourth quarter 2007 grew to 18.8 million units, compared to 11.1 million units in the fourth quarter 2006. Nokia shipped well over 11 million Nokia N-series devices and over 2 million Nokia E-series devices during the fourth quarter 2007.

The following chart sets out, by geographic area, Nokia's mobile device volumes for the periods indicated, and provides year on year and sequential growth rates.

| NOKIA MOBILE DEVICE VOLUME BY GEOGRAPHIC AREA | | | | | |
|---|---|---|---|---|---|
| (million units) | Q4 2007 | Q4 2006 | YoY Change (%) | Q3 2007 | QoQ Change (%) |
| Europe | 37.2 | 33.3 | 11.7 | 29.0 | 28.3 |
| Middle East & Africa | 23.6 | 15.5 | 52.3 | 19.3 | 22.3 |
| China | 20.2 | 14.6 | 38.4 | 18.9 | 6.9 |
| Asia-Pacific | 34.0 | 23.7 | 43.5 | 29.5 | 15.3 |
| North America | 5.1 | 5.9 | -13.6 | 5.4 | -5.6 |
| Latin America | 13.4 | 12.5 | 7.2 | 9.6 | 39.6 |
| Total | 133.5 | 105.5 | 26.5 | 111.7 | 19.5 |

\*      \*      \*

Based on our preliminary market estimate, ***Nokia's market share for the fourth quarter 2007 was 40%, compared with 39% in the third quarter 2007 and 36% in the fourth quarter 2006***. On a year on year basis, Nokia gained market share in every region except North America and Latin America, where market share declined. On a sequential basis, Nokia's market share increased substantially in Middle East & Africa, with modest gains in Europe, Asia-Pacific and Latin America. This was partially offset by a market share decline in North America, as well as a slight decline in China. Nokia's device volumes for the fourth quarter 2007 continued to be somewhat constrained by component shortages, linked to the high demand for Nokia products and seasonal industry growth in the fourth quarter. These component constraints have started to ease in the first quarter 2008, as we work with our suppliers to get the necessary supply to match the demand for our products.

Nokia's average selling price (ASP) in the fourth quarter 2007 was EUR 83, down from EUR 89 in the fourth quarter 2006 and up from EUR 82 in the third quarter 2007. ***The lower year on year ASP in the fourth quarter 2007 was primarily the***

*result of the negative effect of a significantly higher proportion of entry level device sales and the weaker US dollar on Nokia net sales. The slight sequential increase in ASP in the fourth quarter 2007 reflected a greater percentage of sales of recently launched mid and high end devices, which offset continued robust sales from the entry-level segment.*

**Mobile Phones**

Fourth quarter 2007 net sales grew 5% to EUR 7.4 billion, compared with EUR 7.1 billion in the fourth quarter 2006. *Strong overall volume growth was partially offset by a significant ASP decline year on year, driven primarily by a higher proportion of entry-level sales.* Net sales year on year growth was strongest in Middle East & Africa and Asia-Pacific, followed by China. Net sales year on year were down significantly in North America and Latin America and to a lesser degree in Europe.

Mobile Phones operating profit grew 48% to EUR 1.9 billion, compared with EUR 1.3 billion in the fourth quarter 2006, with an operating margin of 25.0% (17.8%). *The increase in operating profit for the fourth quarter 2007 was driven primarily by an improved gross margin, compared to the fourth quarter 2006. The increase in Mobile Phones gross margin was primarily due to newer and more profitable devices shipping in volumes, especially in the mid-range.*

(Emphasis added).

      96.     In regards to the industry and Nokia's outlook for the first quarter and full year 2008, the Company's press release, made part of its 6-K filing incorporated by reference in the governing Plan documents, in relevant part, stated:

INDUSTRY AND NOKIA OUTLOOK FOR THE FIRST QUARTER AND FULL YEAR 2008

              *       *       *

•     We expect Nokia's device market share in the first quarter 2008 to be approximately at the same level sequentially.

•     Nokia continues to expect industry mobile device volumes in 2008 to grow approximately 10% from the approximately 1.14 billion units Nokia estimates for 2007.

•     Nokia continues to expect the device industry to experience value growth in 2008, but expects some decline in industry ASPs, primarily reflecting the increasing impact of the emerging markets and competitive factors in general.

•     Nokia continues to target an increase in its market share in mobile devices in 2008.

      97.     Nokia went beyond generalized predictions of corporate success when it issued additional deceptive disclosures designed to convince the market, including the Plan participants,

that the Company would continue to perform well in spite of industry-wide decreases in ASPs. For example, Nokia implied that if it was not for component shortages stemming from the unforeseen high demand for its consumer products, the mobile device volumes, and thus profits, would have been even larger than was ultimately reported in the financial reports. Furthermore, Nokia claimed that the company was in the process of ensuring that there would be less component shortages in 2008:

> *Nokia's device volumes for the fourth quarter 2007 continued to be somewhat constrained by component shortages linked to the high demand for Nokia products and seasonal industry growth in the fourth quarter. These component constraints have started to ease in the first quarter 2008, as we work with our suppliers to get the necessary supply to match the demand for our products.*

98.     Additionally, within the January 24, 2008 press release, Nokia's President and Chief Executive Officer ("CEO"), Olli-Pekka Kallasvuo ("Kallasvuo"), stated:

> Nokia's excellent fourth quarter contributed to a year of high growth and increased profitability for the company, while our industry leading product portfolio drove our device business to an estimated 40% market share in the fourth quarter. *At the same time we again increased our quarterly device margins, allowing Nokia to continue to invest for innovation and growth.* It was a year of important strategic initiatives by Nokia, with Nokia Siemens Networks starting operations, our internet services effort taking shape around Ovi, and the announcement of the pending acquisition of NAVTEQ.

> Facing a market that remains intensely competitive, *we are continuing to improve our leading device portfolio as well as execution at Nokia Siemens Networks. With this we believe Nokia is well positioned for growth in 2008.*

(Emphasis added).

99.     During the Class Period, these and other similar statements deceived investors, including the Plan participants, by giving them the impression that new phones in Nokia's development pipeline would imminently be available for sale in the emerging markets and that

new products would continue to be available to counter the adverse effects of decreases in ASPs that were facing the entire industry.

100.    Plaintiffs believe that after a reasonable opportunity for further investigation and discovery, the evidence will show that, in reality, Nokia's ability to get new products to the market was greatly hindered by substantial software issues in their cellular phones' operating platforms. In this regard, a confidential informant who was a former Nokia Vice President both prior to and during the Class Period[4], provided information to counsel in the companion securities action against Nokia, regarding Nokia's product development and launch schedule. According to the former Vice President, the Company had three distinct software platforms: S-30 for lower prices phone, S-40 for mid range phones and S-60, which is also commonly referred to as Symbian, Nokia's high end phones. Additionally, this informant stated that during the Class Period, Nokia was experiencing problems with its Symbian based operating system and that these problems had forced planned product launch dates to be moved back to a later time.

101.    Other former employees further substantiated the representations from the former Vie President to counsel in the companion securities action against Nokia. For example, another confidential informant, who was a former Nokia Senior Business Development Manager prior to and during the Class Period, recalled that he/she routinely received e-mails that communicated software-related errors on new Nokia phones and that Nokia was experiencing ongoing problems with its Symbian software during the Class Period. Similarly, a former Nokia Senior Material Project Manager prior to and during the Class Period, confirmed that Nokia experiences various software related problem that had delayed product launch dates.

---

[4]      References to confidential informants herein were obtained from the Amended Complaint For Violation Of The Federal Securities Laws, filed with the Court on August 23, 2010 in a companion securities case pending against Nokia Corporation, *City of Roseville Employees' Retirement System v. Nokia Corp.*, Civil Action No. 2-CV-0967 (GBD).

102.    Instead of disclosing this negative information, the Company actively touted the launch of new products during the period.  The launch of these new products, particularly the Company's mid and high end phones that garnered larger profit margins than the low end phones, was held up as the means that Nokia would be able to offset the negative effects resulting from lower ASPs.  This falsely reassured investors that Nokia would be able to continue to increase its market share and profit margins despite the declining average sale prices of cellular phones in emerging markets.

103.    Additionally, all of the statements made in the press release were reaffirmed on that same day when Nokia filed its Form 6-K with the SEC.  As noted *supra*, all of the statements contained in the Company's public filings were incorporated into Plan documents and communications and as such, constitute fiduciary communications made in connection with Plan participants' retirement benefits pertaining to Plan investments.

104.    On January 24, 2008, the same day the press release was issued and the Form 6-K was filed with the SEC, the Company held a conference call with analysts and investors, including the Plan participants, to discuss the Company's financial results for the fiscal fourth quarter of 2007 and full year 2007.  When asked about increased competition from competitors into the low end segment of the cellular market, Nokia executives, including CEO Kallasvuo and Nokia's Chief Financial Officer ("CFO"), Richard A. Simonson ("Simonson"), downplayed the seriousness of the competitive threats.   They indicated that: (1) the competition faced high barriers of entry, such as economies of scale (2) Nokia was vigilant and closely watched their competitors' actions; (3) the Company had not yet seen any change in the competitive dynamics of the Chinese market; and (4) the Chinese market was simply "business as usual."  The Nokia executives, in relevant part, stated:

CEO Kallasvuo:

It's good to be on this call after such an impressive fourth quarter at Nokia. But our performance seems at odds with the volatility we all are witnessing in the equity markets and the financial sector. *We closely monitor development in our markets, and the reality as we see it today is that the handset market is strong. We believe channel inventories for the industry and for Nokia are at normal levels. We are expecting a normal seasonal decline in the device market in Q1, and the demand for our products is good.*

I feel quite good about Nokia's fundamentals across the globe. *The emerging markets continue to see growth. India and China have each been adding 7 million subscribers a month, and Africa is only just starting to take off. The spread of wireless telephony in these regions has delivered great economic benefit, and our position in these markets remains strong.* In Europe, we are benefiting from strong demand for our new products. In Latin America, we have strong share and have steadily delivered a more diversified portfolio, from the entry-level to high-end multimedia computers. And in the U.S., while our position continues to be weak, we are delivering on our commitment to supply customers' products to the major U.S. carriers.

*       *       *

Let's look at the fourth quarter. Our device business continued its excellent performance, with market share and margins up nicely, as many of our new products clearly started to have a positive impact. We reached an estimated 40% market share in the fourth quarter, and our combined device operating margin was up 2 percentage points sequentially, and 8 points year-on-year, *showing again that we can simultaneously increase market share and margin.*

*       *       *

On to the product highlights for the fourth quarter. *As you know, in the fourth quarter we faced our biggest ramp up of new products ever, even while we had component shortages as we ended the quarter, so we certainly had our work cut out for us. I'm pleased to say our teams and suppliers really delivered.* In the entry level, the new Nokia 1200 and 1208, based on our single chip platform, ramped well. These two products combined shipped over 20 million units in the quarter, a big increase from just over 3 million units in Q3, so a really impressive accomplishment.

The Nokia 1110 and 1600 families still had big volumes during the Q, combining to over 30 million units. The Nokia 2630 Barracuda started shipping in volumes in the quarter, and was already in our top 10 volumes. In the mid-range, the Nokia 6300 continued its good momentum, shipping over 7 million units in the fourth quarter. During the quarter, we also started volume shipments of the Nokia 6500 family, and the Nokia 5310 and 5610 XpressMusic devices. The demand was good for all of these devices. In fact, the 6500 family was already in the top 5 for revenue and profit, and sold approximately 1.5 million units in Europe alone. The new 5310 and 5610 were also strong contributors of both revenue and profit in Q4. Nokia N-Series multimedia computers had volumes of well over 11 million units during Q4, and the Nokia N73 and N95 were again the

biggest products in revenue for multimedia during the quarter. The N95 continued to see excellent demand and was the number one profit contributor for Nokia. During the fourth quarter, the new N95 8-gig came out of the gate very strong, especially in Europe, performing better than we expected. The combined N95 volumes were up 30% sequentially, and we also sold almost 6 million units since the device started selling. For enterprise solutions, the Nokia E65 was again the best selling product. And the newest products, the Nokia E90 Communicator and E51 also performed very well in the Q. During the quarter we shipped almost 19 million convert devices in total. In 2007, we clearly improved our product portfolio, with products like the 6300 and N95 leading the way. But I am pleased to see that the new products we started shipping in volumes in the fourth quarter are helping to diversify our portfolio further. New products that started shipping in volume in Q4 made up about 30% of our device revenue and profit in the Q [quarter].

*Now the important products for the first quarter. In the entry level, we expect the Nokia 1200 and 1208 will ship in very high volumes, while we expect the 1110 and 1600 families will start their ramp down. We are also expecting the Nokia 2630 Barracuda to continue its good momentum. We plan to start shipping the recently-announced Nokia 2600 classic, the [pin] entry product with changeable covers. In the mid-range, we expect that the Nokia 6300, the 6500 family, and the Nokia 5310 and 5610 XpressMusic devices will be big sellers.* For the N-Series, the significant products are expected to again be the Nokia N95 and N73 multimedia computers. The Nokia N82, which we started to ship in Q4, will see significant promotional activity during the quarter. For the E-Series, we expect the key products will be the Nokia E65, E90 Communicator and the Nokia E51. On the Nokia/Siemens Networks, we again delivered improved results, with a sequential increase in net sales and margins in the fourth quarter.

Richard A. Simonson ("Simonson"), Nokia's Chief Financial Officer:

*As we said in our press release today, our overall volumes for the fourth quarter continued to be somewhat constrained by component shortages. In the first quarter, it looks like these have eased, and we are working well with our vendors to get the necessary supply to match the good demand for our products. Nokia's fourth quarter device average selling price, or ASP, was EUR 83, up slightly sequentially from EUR 82 in Q3, and down 7% year-on-year from EUR 89 in Q4 of 2006.* The slight sequential increase in ASP in the fourth quarter reflected a greater percentage of sales from recently launched mid- and high-end devices, which offset continued robust sales from the entry-level segment. The lower year-on-year ASP in the fourth quarter 2007 was primarily the result of the significantly higher portion of entry-level device sales, and some negative effect of the weaker U.S. dollar on Nokia's reported sales.

Mike Walkley, an analyst with Piper Jaffray:

*. . . There have been several competitors indicating they want to go more into the low end. I was wondering if you could update us if you're seeing any of your large OEM*

*competitors in the sub-50 [euro price point] or even the sub-30 euro [price point] segment, and how you see that segment in terms of competitive threat from maybe Asia or other players, longer term?*

CEO Kallasvuo:

Okay, so I think there's been quite a lot of talk here in the past when it comes to entering the lower end, and that talk that we need to take very seriously has been ongoing here, and now as well. And it's — it's very clear, *make no mistake about that, that some of our competitors have ambitions when it comes to the lower end of the market. We are taking that very seriously. We are watching them* **and** *hence, we really need to look - look at our competitive position and the way we work, really, in a way that we don't rest and become complacent in that respect. I think especially Samsung's ambitions need to be taken seriously. They will make an effort, but how low can they come here? I think that's a big question. So really looking at the sub-30 euro market, it's extremely tough. You need extremely big volumes in order to get there, and be competitive and make money, and so far we have been able to - to defend, in a pretty proactive way, that market.*

Andrew Griffin, an analyst with Merrill Lynch:

. . . I just wondered what happened, *just following on the low end question, is what happened in China, where if I ex-out your NSN group revenues, it looks like handset revenues actually fell sequentially. Your units were up, implying quite a big fall in average selling prices.*

CEO Kallasvuo:

Yes, again there, this might sound a bit - a bit superficial when I say *in China I think the situation is business as usual. We didn't see any - any change in the market dynamics that would indicate that we would be somehow - somehow losing our position, or losing markets in that market. There's always some volatility between the quarters, that's a natural part of this business, has always been, will always be, but a change in the competitive dynamics in China, we have not seen.*

CFO Simonson:

. . . *I mean China, we have to understand, has been growing at 6 million, 7 million new subscribers per month, and that's after having many years of explosive growth. It's interesting, China's always been a higher ASP market than people would have kind of thought.* You need to look deeper in there. That's reflective of them purchasing across all the spectrum. But the real acceleration has been in this sub-30 euro end, and we've seen over the year, and also sequentially quarter-on-quarter, a real push there, and that's reflected in our numbers, it's reflected by the push by CMCC [China Mobile Communications Corporation]. So that is a factor in the overall market, and not to be mistaken for Nokia's market position in the dynamics, as Olli-Pekka mentioned.

\*         \*         \*

Sharif Baker, an analyst with Citigroup:

Thank you very much. Just a question really on market share, In terms of your ambitions over the 12 to 18 months, in terms of how much additional share you believe that you can actually take. *You talk about in the low end about in the sub- 30 euro segment there being very high barriers to entry because of scale. I'm just wondering how much higher can your share go in markets such as Africa, the Middle East and Africa, or in some of the Asian markets?* And maybe, looking at it from a different angle in terms of Europe, as you start to see or probably start seeing increasing competition, is there a risk that share in Europe could - has actually plateaued or you can actually take additional share, or whether there's some risk that share could come down? . . .

CEO Kallasvuo:

I will start. So the order of market share thinking when it comes to our target sharing, so we have clearing internally articulated that we want more than 40. We have not gotten fixated to a number, that's very clear. So we're not saying it's 41, 43, we're not giving a target like that, not even internally, because economies of scale don't stop at a certain level, they continue to increase the higher you go. But of course it's very true, at the same time, that this is tough, and there are no pockets here that you could simply find and say, "This will give me a lot." And in that way, this is very, very consistent and hard work, and in different places here, not to lose and gain. And in that way – in that way there's no magic bullet here.

Then of course, having said that, it's very clear that the markets, like we have discussed many time before, the markets where our market [share] is highest are growing more rapidly than some of the other markets. In that way, we have this type of dynamism here relates to the diversity of business and to the structure in all of our sales in different markets, and that comes to play here. And it's very clear, we've got some upside in the U.S., no doubt about that, CDMA definitely, once we ramp up in the new mode of working. It will come to play here and definitely we've got quite a lot of plans with regard to Japan as well. So in that way, those markets are getting special attention.

Nowhere in this organization have we articulated that, you know, this market share is too high. Any given market, nowhere, everybody has the same target setting, take more share. I think it's widely understood. But it never happens overnight because there are no - no miracles that are possible here.

\*          \*          \*

Tim Long, an analyst with Bank of America Securities:

Could you just talk to us a little about the moving parts, when we think about how sustainable the gross margin performance could be? *Maybe if you could talk about the component side, if there was an impact one way or the other on the tight components, you know the impact maybe on having some of your products on allocation, and what new products, new products in the mix, which I guess were*

*about 30%, [meant] to that gross margin line and how we think about it going forward.*

And Olli-Pekka, if you could just clarify, I think you said the channel inventories were lower than they were a year ago. I'm just curious, if your volumes were 25% or so higher entering this year, does that just mean that inventories were too high a year ago? How is that not a positive, as you look into next quarter? How does that not translate into lower channel inventories than normal? . . .

CFO Simonson:

. . . [Y]ou asked in terms of looking at gross margin. Now here – you asked a number of questions here, let me try to step through them in a clear way.

One thing that's important about the gross margin development we had and the sustainability of that, and one of the things that we think can give us some comfort going forward is, think about the gross margins in the low end and the ultra-low end. We brought those up through the execution of our refresh of the product portfolio there, continuing fresh, coupled with the distribution system, and we brought it up into the, you know, kind of mid-2Os level last year. We worked that higher this year, I said previously we've gotten those margins up, they are not too different than what we did (inaudible) the overall mobile phone margins. And, you know, that's very important, that if you can maintain the margin profile in the entry-level and the ultra low end level, and that's where the volume's coming from, and the growth's coming from, that's real important. It gives you that kind of base to work from. And, as you mentioned, in terms of component price, I think there was some concern by many, as people asked about well, with commodity prices rising and that, aren't you going to be unable to get your normal pricing erosion? In fact we didn't see that. And while we're not immune to commodity prices, it, it really hadn't impacted us, and we were able to do better in some other areas, again taking advantage of our scale, and taking advantage of working closer with our suppliers so they can minimize their costs along the chain. So we did do very well there in terms of the component cost.

And in terms of allocation, if the question was implying that because we had some component constraint and therefore we're short a little of capacity on some devices and that caused us to be able to price those higher, I don't look at it that way. Allocation to me is when you have such demand for a product that you can't get it out there, and then you are able to do the price. We didn't get any benefit in the gross margin from the fact we were short on a few components, if that was the angle of the question there...

(Emphasis added).

105.    On this news, the price of Nokia Stock increased, rising $4.05, or more than 12%, to close on January 24, 2008 at $36.48 per share, on unusually heavy trading volume.

106.    On January 28, 2008, Nokia issued a press release announcing its intent to purchase Trolltech ASA ("Trolltech"), which Nokia described as a leading provider of software development platforms and held a conference call with securities analysts to discuss the impending acquisition.  Through these communications, Nokia executives expressed that: (1) software was vital to Nokia's continued growth strategy; (2) software was an area where Nokia could differentiate itself from the competition and maximize value to consumers; (3) the acquisition of Trolltech would improve the already high quality of the software on Nokia phones; and (4) the acquisition would increase the speed in which the Company could get new products from their development pipeline to the market.  However, these statements failed to acknowledge or disclose that the Company was experiencing significant software-related problems with the development of its Symbian operating system, which was delaying the scheduled product launch dates of its more profitable new phones and that these delays made the Company's stated high volume growth strategy impossible to achieve.

107.    In the January 28, 2008 press release entitled, "Nokia to acquire Trolltech to accelerate software strategy," the Company touted the benefits of this acquisition in terms of increased volume sales and improvements in the amount of time new products would get to the market.  Specifically, the Company stated, in relevant part:

> Espoo, Finland and Oslo, Norway - Nokia and Trolltech ASA today announced that they have entered into an agreement that Nokia will make a public voluntary tender offer to acquire Trolltech (www.trolltech.com), a company headquartered in Oslo, Norway and publicly listed on the Oslo Stock Exchange.  Trolltech is a recognized software provider with world-class software development platforms and frameworks.  In addition to the key software assets, its talented team will play an important role in accelerating the implementation of Nokia's software strategy.
>
> The acquisition of Trolltech will enable Nokia to accelerate its cross-platform software strategy for mobile devices and desktop applications, and develop its Internet services business.  With Trolltech, Nokia and third party developers will be able to develop applications that work in the Internet, across Nokia's device portfolio and on PCs.  Nokia's software strategy for devices is based on cross-